Filed 1/22/16  P. v. Carr CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068678 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1203885) |
| TYDRICK DEVON CARR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County,

R. Glenn Yabuno, Judge.  Affirmed.

Rodger P. Curnow, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Collette C. Cavalier, Arlene A.

Sevidal and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendant Tydrick Devon Carr appeals from a judgment of conviction after a jury trial. The jury convicted Carr of murder, actively participating in a criminal street gang, and being an ex-felon in possession of a firearm, after Carr shot an associate following a beating of the man by fellow members of Carr's gang.

On appeal, Carr contends that the trial court abused its discretion in admitting evidence of an earlier, uncharged shooting in which he participated, arguing that the prior shooting was not similar to the charged crime and contending that evidence of the prior uncharged act was far more prejudicial than probative. Carr further contends that the trial court deprived him of his state and federal constitutional right to present a defense by excluding evidence that he maintains demonstrated a third party's culpability for the murder. Carr also contends that the jury's true finding on the gang enhancement with respect to the murder is not supported by substantial evidence. Finally, Carr claims that the prosecutor committed misconduct during closing argument by presenting a brief initial closing argument and saving the bulk of his argument for rebuttal, effectively "sandbagging" the defense.

We conclude that none of Carr's contentions has merit. We therefore affirm the judgment.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

    1.    *The prosecution's case*

Amalia White and Christopher Sly began dating in May 2012.  Sly went by the moniker "Cap" and was an "OG" from the Rollin' 40s criminal street gang.[1]  In July, White called the police after Sly stole her car and cell phone.[2]  Sly pled guilty to possession of stolen property.  After Sly was released, White and Sly resumed their relationship.  Sly became physically abusive.  He would hit White when she would not let him take her car or when she would not allow him to invite other people to her home.  White was afraid of Sly.  She once filed a report of domestic violence, but according to White, the police did not follow up with her.

Sly and Carr were friends.  Carr was a documented member of the Rollin' 30s criminal street gang.  The Rollin' 30s and Rollin' 40s are part of an association of Crip-based gangs known as the "Naybahood."  Members of the Naybahood would hang out together and commit crimes together.

Sly introduced Carr to White's 14-year-old daughter, A.  Carr and A. began dating at the end of July 2012.  Carr would bring his nine-millimeter gun, which he regularly kept with him, to White's home.

---

[1]    The term "OG" refers to an "original gangster."  An "OG" is a gang member who has earned a degree of status and respect after "years and years of service to the gang."

[2]    Sly did not own a vehicle.

On the evening of August 23, 2012, Sly called White and told her to come to the Double Doors apartment complex in San Bernardino. Sly told White to bring A. so that A. and Carr could see each other.

Approximately 15 to 20 minutes after White arrived at the Double Doors apartment complex, Sly appeared and got into the front passenger seat of White's car. Sly was carrying a cup of vodka. Another man, Lloyd Coleman, got into the back seat of the car. White had never seen Coleman before. Although Coleman associated with Naybahood gang members, he was not a member of a gang. Coleman appeared to be drunk. His speech was slurred, and White could smell alcohol on his breath. According to White, Coleman made inappropriate comments directed toward A.

The group drove to the 99 Cent store and then returned to the apartment complex. Upon returning, A. left the vehicle with Sly and Coleman, and spoke with Carr briefly. White parked her car and stayed in the vehicle.

White heard Carr's sister, Rhonda Harris, who was also a member of the Rollin' 30s, arguing with Coleman. White heard Coleman call Harris a " 'bitch[ ].' " Harris told Coleman that he was "nobody over there" and said that she did not know why he was there. White then heard A. and Coleman arguing. Coleman called A. a "bitch" and told her that nobody knew who she was. A. responded that she had been over frequently, and told Coleman that he was the " 'nobody' " because she had never seen him before.

White got out of the car and saw that A. and Coleman were arguing face to face. Coleman moved toward A. as though he was going to push her. Coleman took off his t-shirt and threw it on the ground. A. punched Coleman in the face. Sly "came out of

4

nowhere," picked up Coleman's shirt and began to attack Coleman. Sly hit Coleman, and Coleman fell backward. Sly hit Coleman another three or four times after Coleman fell. Eric Newsome, a Rollin' 40s gang member, joined in, hitting Coleman in his torso.

Coleman was on his back and breathing "really heavily." Carr walked over to Coleman. Carr had the black nine-millimeter gun that White had seen him with on many occasions. Standing less than two feet from Coleman, Carr put the gun close to Coleman's neck and pulled the trigger. White ran toward A. and Sly. Sly told White to take A. and leave.

Police officers arrived at the scene of the shooting at approximately 10:05 p.m. They found Coleman lying on his back and leaning slightly to the right. Blood was oozing from his nose and mouth. Coleman had suffered a gunshot wound to his neck. He was pronounced dead at the scene.

The following day, Sly called White and asked her to pick him up. White was scared about what might happen if she did not do what Sly asked of her. Sly and Carr spent the evening at White's home on the 24th of August. While at White's house, Carr cleaned the gun he had used to shoot Coleman. White drove Carr to the border of Adelanto and Victorville and dropped him off at an ARCO gas station. Sly then instructed White to pick up Carr from the gas station the following day.

Dr. Steven Trenkle conducted an autopsy on Coleman's body. Coleman had a small laceration under his left eyebrow, which was consistent with having been punched. Coleman had both alcohol (.16 blood alcohol level) and marijuana in his system at the time of his death. Coleman suffered two gunshot wounds to his body—one in his neck

5

and one in his upper back. In his autopsy report, Dr. Trenkle concluded that Coleman had been shot in the back, and that the bullet had exited his neck. However, at trial, Dr. Trenkle testified that there was a possibility that his report had been incorrect with respect to the nature of the wounds, and said that the bullet could have entered through Coleman's neck and exited through his back. At the time he prepared his report, Dr. Trenkle had not been aware of an eyewitness who had seen Coleman get shot in the neck, and he had failed to test black material found in the wound on Coleman's neck, which could have indicated that the neck wound was the entrance wound.

Five days after the shooting, a detective conducted an audio-recorded interview with White. White was initially reluctant to discuss details about what she had seen, but she was more forthcoming later, admitting that she had been present when the shooting occurred. White described the shooter as a Black man about 20 years old; her description was consistent with Carr's appearance. White eventually told the detective exactly what she had seen, but she also indicated that she was afraid of Sly and Carr. White told the detective that Sly "called the shots" at the Double Doors complex.

Police arrested Carr at an apartment at the Double Doors complex on August 29, 2012. Officers recovered four firearms from the apartment, one of which was a Glock 17 nine-millimeter gun.[3] At trial, White testified that the Glock appeared to be the same weapon that Carr had used to kill Coleman. A detective conducted an audio-recorded

---

3    There were other individuals at the apartment at the time Carr was arrested, including a man who opened the door, and two women who exited the apartment with their hands up after police surrounded the apartment and ordered Carr to come outside.

6

interview of Carr. During this interview, Carr denied having any knowledge of the events surrounding Coleman's shooting, or even that Coleman was dead. In fact, Carr told the detective that he thought Coleman was in the hospital.[4]

While Carr was in jail awaiting trial, he placed a call to Starnisha Matthews.[5] Carr told Matthews that "they" were going to talk to her, and said, "I was with you all day alright?" Matthews replied, "[B]oy that's putting me on the stand don't you know that?" Carr responded, "You don't have to if you don't want to." Matthews then said, "I'm not hell dogs I'm getting up there . . . ain't gonna lie . . . . That's what I'm not, I can't do that. I'm sorry but I cannot do that."

On January 10, 2014, a deputy found a "kite" inside a blue inmate request slip hidden inside a rip in the mattress of inmate Claudie Lee Jones.[6] The kite said:

> " 'To Nuborn from Big Homie, "R" 30s Crip.'
>
> " 'Aye, my lawyer going to come see you soon. I need you to say that you was there on my murder and you was right there when it happened. And say Tydrick Carr was not in the Dauble Doors [*sic*] when that happened. It's going to help my case, Little Homie. Say Cap was fighting, and you heard a gunshot and rain [*sic*].' "[7]

---

[4]    Later during the interview, Carr indicated that someone had told him that Coleman had died.

[5]    During his interview with the detective, Carr had identified Matthews as his girlfriend. Carr also indicated that he had been with Matthews at the time of the shooting.

[6]    A deputy testified that a "kite" refers to a "way to relay jailhouse messages" and "covertly send things back and forth."

[7]    Sly went by the moniker 'Cap.'

On January 13, 2014, another deputy searched Carr's jail cell for a sample of Carr's handwriting. The deputy found two medical request slips under Carr's bed. Detective Turner also obtained a court-ordered writing sample from Carr, in which Carr wrote the words that were found on the kite discovered in Claudie Lee Jones's cell. Detective Turner compared the writing samples with the writing on the kite. Detective Turner went through various elements in the writing samples and the kite to demonstrate where there were similarities in the making of the letters and words. In Detective Turner's opinion, the kite appeared to have been written by Carr.[8]

The jury also heard evidence about a shooting in which Carr participated 17 days before Coleman was shot. In that incident, which occurred on August 6, 2012, Carr, Sly, and another man, Darrell Pratt, got into White's car. Carr had in his possession the same gun that he later used to kill Coleman. Sly drove the vehicle, while White was in the front passenger seat. The men went searching for a person who had robbed Pratt's cousin, and eventually found the person in a white Chevy Caprice in a McDonald's parking lot.

Sly and the others in the car followed the Chevy Caprice to a gas station. Sly parked on a side street, and Carr and Pratt got out of the car with weapons. As the Chevy Caprice drove by, Carr, Pratt, and a third man opened fire on it. The Chevy Caprice crashed through a wall.

---

[8]    The prosecutor also put the various writing samples on an overhead projector so that the jury could see the writings.

All three men got into the back seat of White's car, and Sly then drove by where the Chevy Caprice had crashed into the wall. Carr, Pratt and the third man shot their guns at the Chevy Caprice as they drove by. Sly shouted, " '[N]aybahood.' "

Sly warned White not to tell police about the shooting. He threatened to have her killed if she did.

Detective Simpson, a gang expert, testified that the August 6 shooting was "[d]efinitely" a gang-related shooting. The victims of that shooting were members of the Fudge Town Mafia. It is common for gang members to yell out the name of their gang when shooting at victims, and Carr's participation in this shooting demonstrated his willingness "to kill a person" and showed that he's "putting in a lot of work" for his gang.

Simpson also testified that the primary activities of the Rollin' 30s were burglaries, robberies, sales of narcotics, and assaults and murders, often involving firearms. Simpson testified that members of the gang had suffered convictions for possession of cocaine base for sale, attempted murder, residential burglary, and receiving stolen property. Simpson testified that Carr was a member of a criminal street gang. Simpson based this conclusion on Carr's numerous police contacts and gang cards, and the fact that Carr had admitted to being a member of the Rollin' 30s gang.

The prosecutor presented Simpson with a hypothetical situation that paralleled the circumstances of the August 23 shooting. Based on his knowledge of gang activities, Simpson opined that the shooting was committed for the benefit of, at the direction of, or in association with a criminal street gang. This is because the victim in the scenario was

9

showing disrespect to someone in the gang, and pursuant to gang rules, other members of the gang "stick up for members of [their own] gang." In addition, very often, gang members "see women or their women or their girlfriend as property," and so "when you are disrespecting their girlfriend you're disrespecting them."

On rebuttal, the prosecution called Carr's cousin, Tonette Jones, to testify. Jones said that she did not know anything about Carr's gang affiliation, and she did not know Claudie Lee Jones. Jones acknowledged on the stand that she had spoken with one or more police officers after the shooting, but denied having told an officer that she did not see or hear what had happened. At trial, Jones said that she had witnessed the fight involving Coleman. She heard a gun go off, but she could not see who the shooter was. Jones did not see White at the scene, and said that she had not seen Carr, either. Jones admitted that she did not know where Carr was that evening, but she stated that she had not seen him at the time of the shooting.

2.    *The defense*

A. testified on behalf of Carr. She acknowledged having been involved in a romantic relationship with Carr. A. said that she had never seen Carr with a gun in his possession. A. testified that on the evening of August 23, she had gone to the store with White, Sly, and Coleman. Most of A.'s testimony was similar to White's concerning the events leading up to Coleman's shooting. However, A. said that she did not know where Carr was when Coleman was shot. She claimed to have been getting into White's Carr when she heard the gunshot, and she said that she did not see who shot Coleman.

10

B.    *Procedural background*

The People charged Carr with one count of murder (Pen. Code[9], § 187, subd. (a); count 1), one count of street terrorism (§ 186.22, subd. (a); count 2), and one count of being an ex-felon in possession of a firearm (§ 29800, subd. (a); count 3).

The charging document also alleged that with respect to count 1, Carr personally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)).  With respect to counts 1 and 3, the charging document alleged that Carr acted for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)).  The information also alleged that Carr had committed a prior serious felony (§ 667, subd. (a)), and a prior strike felony (§ 1170.12, subds. (a)-(d); § 667, subds. (b)-(i)).

A jury convicted Carr on all counts and found true all the personal use and gang enhancement allegations.  In a bifurcated proceeding, the trial court found true the allegation that Carr had a prior serious felony conviction.

The trial court sentenced Carr to a determinate term of 10 years in state prison, and an indeterminate term of 75 years to life.

Carr filed a timely notice of appeal.

---

9      Further statutory references are to the Penal Code unless otherwise indicated.

11

DISCUSSION

A.   *The trial court did not abuse its discretion in admitting the uncharged offense evidence; admitting the evidence did not violate due process or render the trial unfair*

Carr challenges the trial court's admission of evidence regarding Carr's participation in the August 6 shooting of the Chevy Caprice to establish Carr's intent, knowledge and motive in the August 23 shooting of Coleman.  Carr contends that the evidence regarding the earlier shooting was not sufficiently similar to permit it to be admitted for those limited purposes.  Carr further argues that even if the prior incident was sufficiently similar, the trial court should nevertheless have excluded the evidence because it was unduly prejudicial.

1.   *Additional background*

The prosecutor filed a motion in limine to introduce evidence of the uncharged August 6 shooting for purposes of demonstrating Carr's intent, motive, and knowledge in this case.  The prosecutor argued that the August 6 shooting was relevant to establish Carr's motive and intent in the current case because both shootings demonstrated Carr's desire to "benefit himself and his criminal street gang."  With respect to knowledge, the prosecutor argued that Carr's conduct during the prior offense was relevant to demonstrate that Carr anticipated the consequences of his actions when he shot Coleman approximately three weeks later.  Finally, the prosecutor contended that the evidence of the prior uncharged act was more probative than prejudicial.

The prosecutor later filed a follow-up motion, arguing that the August 6 shooting was also admissible to establish Carr's knowledge that his gang was involved in unlawful activity. That same day, defense counsel opposed the in limine motion regarding the evidence of the August 6 shooting, contending that the August 6 event was too dissimilar to Coleman's shooting to render it admissible, and challenging the relevance of the evidence of that shooting to the current offense.

The trial court granted the prosecutor's motion, concluding that the prior offense evidence went "directly to the issues of intent and motive," and further concluding that the probative value of the evidence was not substantially outweighed by the risk of prejudice.

The trial court instructed the jury that it could consider the evidence of the August 6 shooting only for the limited purpose of deciding whether Carr had acted with the specific intent to benefit a criminal street gang, whether Carr had a motive to commit the August 23 offense, and whether Carr "knew he would murder" Coleman when he shot at him. The trial court further instructed the jury that it could not consider this evidence for the purpose of concluding that Carr had a bad character or that he was predisposed to commit crimes.

2.    *Analysis*

Evidence of a prior crime or bad act is admissible as long as it is relevant to prove a fact such as motive, opportunity, intent, plan, or knowledge. (Evid. Code, § 1101, subd. (b); *People v. Davis* (2009) 46 Cal.4th 539, 602.) " 'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency

13

of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.)

"We have explained that 'there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: "The least degree of similarity . . . is required in order to prove intent. [Citation.] . . . In order to be admissible [for that purpose], the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " ' [Citations.] 'By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity.' " (*People v. Lynch* (2010) 50 Cal.4th 693, 736.)

However, the admission of prior bad act evidence " 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.' " (*People v. Balcom* (1994) 7 Cal.4th 414, 426.) The court must examine whether the probative value of the prior bad act evidence is " 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Id.* at p. 427.)

On appeal, we review a trial court's decision to admit or exclude evidence under Evidence Code section 1101 for an abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

We conclude that the trial court did not abuse its discretion in admitting the evidence of the August 6 shooting pursuant to Evidence Code section 1101 for the

14

limited purposes of demonstrating Carr's intent, motive, and knowledge of the consequences of shooting at Coleman.

Again, the least degree of similarity between the uncharged crime and the charged crime is necessary to admit the uncharged crime for the purpose of demonstrating a defendant's intent with respect to the charged crime. In order to be admissible to prove intent, the uncharged misconduct must be "sufficiently similar" to support the inference that the defendant probably harbored the same intent in both instances. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

In this case, it was alleged that Carr committed the August 23 shooting of Coleman for the purpose of benefitting his criminal street gang, an enhancement that requires the jury to find that the defendant harbored "the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).) In addition, Carr was charged with the substantive offense of actively participating in a criminal street gang, pursuant to subdivision (a) of section 186.22. The jury was thus required to determine whether Carr had "the intent and objective to actively participate in a criminal street gang." (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1514, boldface omitted.) Evidence regarding the shooting on August 6 was sufficiently similar to the alleged conduct on August 23 to support the inference that when Carr acted on August 23, he had the requisite intent to meet the requirements of subdivisions (a) and (b) of section 186.22.

On August 6, Carr, along with Sly and another gang member, Pratt, joined together to commit a violent shooting of someone they believed had robbed, and thereby

15

disrespected, Pratt's cousin.  The crime had many hallmarks of a gang-related shooting.  On August 23, Carr and Sly and another gang member were involved in an attack on someone who was viewed as having disrespected Carr's sister, also a gang member, and one of his girlfriends.  Given that Carr committed both offenses with fellow gang members, it was not unreasonable for the trial court to conclude that Carr's August 6 conduct was "sufficiently similar" to his August 23 conduct to support an inference that Carr "probably" acted with the same intent on both occasions.

Similarly, with respect to Carr's "knowledge" of the consequences of his act in shooting Coleman, the August 6 shooting is sufficiently similar to the Coleman shooting to permit it to be admitted for this purpose, as well.  "[T]o establish knowledge when that element is akin to absence of mistake, the uncharged events must be sufficiently similar to the circumstances of the charged offense to support the inference that what defendant learned from the prior experience provided the relevant knowledge in the current offense."  (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 242-243.)  The trial court instructed the jury that in order to find Carr guilty of first degree murder, the jury had to find that he acted willfully, deliberately, and with premeditation.  The court informed the jury that Carr acted "deliberately" if he knew "the consequences" of his conduct.  The evidence from the August 6 shooting could demonstrate that Carr was not mistaken about the nature of the gun (i.e., whether it was real or fake, whether the safety was on, and/or whether it was loaded) when he shot at Coleman on August 23.  Carr's conduct on August 6 undermined any potential claim that Carr shot Coleman by mistake or by accident.  We see no abuse of discretion in this respect.

16

Finally, where evidence of a prior uncharged offense is offered to demonstrate a defendant's motive, the similarity between the offenses is not the issue. Rather, what is required is that the two offenses share a "direct logical nexus," such that the defendant's motivation in committing the prior offense might reasonably reflect on his motive in committing the charged offense. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15 ["the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus"].) Evidence of Carr's motives for shooting at the Chevy Caprice tended to show that he had similar motives with respect to the shooting of Coleman—i.e., to further, promote, or assist in criminal conduct committed by gang members.[10] Thus, the trial court reasonably concluded that evidence of the August 6 shooting was admissible for the purpose of establishing Carr's motivation in shooting Coleman.

We further conclude that the trial court did not abuse its discretion in determining that the probative value of this evidence was greater than its prejudicial effect. Under Evidence Code section 352, evidence is not inadmissible except where the probative value is "substantially" outweighed by the probability of necessitating the undue consumption of time, or creating a "substantial danger" of undue prejudice, confusing the

_____

10      During closing argument, defense counsel specifically raised the question as to Carr's motive, arguing: "What was [Carr's] motive[ ]? He was an acquaintance of Mr. Coleman's. He wasn't involved in the fight. He saw the fight – the argument taking place seventy feet away. Makes no effort whatsoever to get involved in it. So what would be his motive? Just to shoot somebody? I submit to you that's not reasonable."

17

issues, or misleading the jury.  (See also, e.g., *People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*) ["Evidence Code section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect"].)  "Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value.  [Citations.]  A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Holford* (2012) 202 Cal.App.4th 758, 770.)

The trial court balanced the probative value of the evidence of the prior gang related shooting against its potential prejudice to Carr.  Given that Carr was charged with the substantive crime of active participation in a criminal street gang, the probative value of the evidence of his uncharged gang-related activity "is greater because it provides direct proof of several *ultimate facts* necessary to a conviction."  (*Tran*, *supra*, 51 Cal.4th at p. 1048.)  "Thus, that the defendant committed a gang-related offense on a separate occasion provides direct evidence of a predicate offense, that the defendant actively participated in the criminal street gang, and that the defendant knew the gang engaged in a pattern of criminal gang activity."  (*Ibid.*)

Further, the potential for prejudice to the defendant is not simply that the evidence is harmful to the defendant's case.  Rather, "[p]rejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt."  (*People v. Crew* (2003) 31 Cal.4th 822, 842 (*Crew*).)  The evidence of the prior shooting

incident was probative of Carr's guilt with respect to the active participation in a criminal street gang offense, and, to the extent it was offered for other purposes, the court specifically instructed the jurors that evidence of the shooting considered be used only in determining Carr's intent, motive, and knowledge of the consequences. The court's instruction specifically informed the jury that it could not conclude from this evidence that Carr had a bad character or that he was predisposed to commit crimes, thereby protecting against potential prejudice to Carr based simply on emotional bias against him.

We conclude that the trial court's determination that the probative value of the evidence of the August 6 shooting was not "substantially" outweighed by the potential risk of prejudice to Carr was not arbitrary, capricious or patently absurd.

B.      *The trial court did not deprive Carr of the right to present a defense by excluding evidence of a comment that Sly apparently made to Carr in passing*

Carr contends that the trial court erred in denying his request to introduce a statement Sly apparently made to Carr at the preliminary hearing for the August 6 shooting to the effect of, "I did it," and that this error deprived him of his constitutional right to present a defense.

1.      *Additional background*

Before trial, defense counsel told the court that he wanted to introduce an out-of-court statement that he believed would tend to demonstrate that Sly, and not Carr, killed Coleman on August 23. Defense counsel contended that the statement at issue was admissible, despite its out-of-court nature, because Sly intended to invoke his Fifth Amendment privilege against self-incrimination, rendering him "unavailable" as a

19

witness at trial, and also on the ground that the statement constituted an admission of guilt.

The statement that Sly made to Carr occurred on December 13, the date of the preliminary hearing for the August 6 shooting.[11] As a deputy was bringing both Carr and Sly into the courtroom on that day, the deputy overheard Sly talking to Carr. The deputy told Sly to stop talking. Sly said "something to the effect . . . that he wanted his cousin Carr to know that he did not want him to get in trouble and that's why he said– that's why he said Carr did it when Sly was really the one who did it."[12]

The prosecutor argued that it was impossible to know what Sly was referring to when he said that he "did it," and that it was not reasonable to conclude that Sly was admitting to killing Coleman when they were in court that day for a hearing pertaining to a different offense. Rather, the logical conclusion to be drawn, if one believed that Sly was admitting to his role in any crime when he said that he "did it," is that Sly was referring to the case for which he was in court at the time he made the statement.

The trial court ruled that Sly's statement would not be admitted. The court concluded that "the statement cannot with any certainty be equated to this particular case that we are in trial for." The court determined that the statement was therefore not relevant, and ruled that it was also inadmissible pursuant to Evidence Code section 352, because the statement was not sufficiently probative to outweigh the undue consumption of time it would take to litigate the issue.

---

[11] The preliminary hearing for the August 23 shooting was held five days later.
[12] The prosecutor was reading from the deputy's report regarding what had occurred.

20

2.      *Analysis*

" '[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352).' [Citation.]  A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion." (*People v. Lewis* (2001) 26 Cal.4th 334, 372-373.)

We conclude that the trial court did not abuse its discretion in excluding the statement at issue.  The trial court reasonably determined that it was not reasonable to conclude that Sly's statement referred to the shooting of Coleman.  First, it is not at all clear that Sly was even admitting to any sort of criminal conduct.  However, even if one were to construe Sly's statement that he "did it" to refer to some theoretical criminal conduct, it was far more reasonable to conclude that Sly was referring to the shooting that occurred on August 6, which was the incident for which both men were in the courtroom at the time Sly made the statement, and not to the August 23 shooting of Coleman.

Carr contends, for the first time on appeal, that Sly must have been referring to the August 23 shooting because the evidence admitted at trial indicated that Sly did not fire a gun on August 6.  However, the evidence presented at trial with respect to the August 23 shooting of Coleman also indicated that Sly did not fire a gun.  For this reason, the fact that the evidence demonstrated that Sly did not fire a gun during the August 6 shooting does not make it more likely that Sly was admitting to having committed the August 23 shooting than the August 6 shooting when he said that he "did it."

21

Given the minimal relevance of Sly's statement, the trial court did not abuse its discretion in concluding that the probative value of this evidence was outweighed by the undue consumption of time it would take to allow the parties to litigate the issue of what Sly might have been referring to when he made the statement.

C.    *Substantial evidence supports the jury's true finding on the gang enhancement*

Carr contends that the evidence is insufficient to support the jury's true finding with respect to the criminal street gang enhancement allegation.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' "   (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

Section 186.22, subdivision (b)(1) provides a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  "[T]he Legislature included the

22

requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it 'clear that a criminal offense is subject to increased punishment under the STEP Act only if the crime is "gang related." ' " (*Albillar*, *supra*, 51 Cal.4th at p. 60.)

By its terms, section 186.22, subdivision (b)(1) has two prongs: the "benefit" prong and the "intent" prong. A crime can satisfy the first prong when it is committed for the benefit of a criminal street gang, at the direction of a criminal street gang, or in association with a criminal street gang. With respect to the second prong, "all that is required is a specific intent 'to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 (*Villalobos*).)

A gang expert's opinion is admissible as part of the evidentiary showing as to how a crime may benefit the gang. (*Albillar*, *supra*, 51 Cal.4th at p. 63.) " 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

With respect to the first prong, there was evidence that Carr was acting both to benefit a criminal street gang, and in association with a criminal street gang, when he shot Coleman. The evidence demonstrated that Coleman disrespected A., who had an intimate relationship with Carr, a gang member, and was the daughter of another gang member's girlfriend. Coleman also got into an argument with Carr's sister, Harris, who was a gang member. In response to Coleman's behavior toward these women, other members of Carr's gang attacked Coleman. Sly punched Coleman and knocked him to

23

the ground, and Sly and Newsome continued punching Coleman after he had fallen to the ground. Immediately after this, Carr shot Coleman from close range. Detective Simpson testified that "[p]art of gang rules is to stick up for your own gang, to stick up for members of your gang whether it be your sister or just a friend that's from that gang." Detective Simpson further noted that Sly and Newsome's conduct in beating Coleman, and Carr's shooting him, would be seen as addressing Coleman's perceived disrespect of the gang members, resulting from his disrespect of the women who were affiliated with these gang members. Carr's conduct in shooting Coleman benefitted his gang by demonstrating the strength and influence of the gang, the willingness of gang members to commit violence, and even to take lives, and specifically Carr's willingness to "put[ ] in work for the gang" to defend gang members and their affiliates.

Evidence of these events constitutes substantial evidence to support the finding that Carr attacked Coleman *in association with* his criminal street gang, and/or did so to *benefit* the Naybahood by enhancing the gang's reputation as something to be feared.

Substantial evidence also supports the jury's finding that Carr acted with the intent to promote, further, or assist in criminal conduct by a gang member, as required under the second prong of section 186.22, subdivision (b). "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime." (*Villalobos*, *supra*, 145 Cal.App.4th at p. 322.) The evidence clearly shows that Carr committed this crime in concert with Sly and Newsome, known gang members. The jury could have reasonably inferred that Carr acted with the specific

24

intent to promote, further or assist those gang members in the commission of their attack on Coleman when he shot Coleman in the neck.

D.    *The prosecutor did not engage in misconduct or commit error with respect to closing arguments*

Carr contends that the prosecutor committed misconduct in closing and rebuttal arguments.  Specifically, Carr asserts that the prosecutor "[s]andbagged" him by "giv[ing] only a brief opening argument without providing appellant an opportunity to respond to his rebuttal argument."  Carr contends that this tactic gave the prosecution "an undue advantage and prejudiced appellant's defense."

Carr asserts that while the prosecutor's closing argument encompasses 33 pages of the reporter's transcript, his rebuttal argument encompasses 37 pages.  He complains that the prosecutor "saved the bulk of his entire argument for the rebuttal phase," and essentially used the rebuttal to "continu[e] and expan[d]" the prosecution's closing argument, rather than respond to points made by the defense.

1.    *Legal standards*

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

Absent a fundamentally unfair trial under the federal Constitution, prosecutorial misconduct or error does not require reversal of the judgment unless it was prejudicial under state law, i.e., it is reasonably probable that the defendant would have obtained a more favorable verdict absent the misconduct or error.  (*People v. Bell* (1989) 49 Cal.3d 502, 534, 542; *People v. Castillo* (2008) 168 Cal.App.4th 364, 386 (*Castillo*); *Crew*, *supra*, 31 Cal.4th at p. 839.)  If the prosecutorial misconduct or error renders the defendant's trial fundamentally unfair under the federal Constitution, reversal of the judgment is required unless the misconduct or error is harmless beyond a reasonable doubt.  (*Castillo*, *supra*, at pp. 386-387, fn. 9.)

To preserve a claim of prosecutorial misconduct or error, a defendant must timely object and request a curative admonition unless an admonition would not have cured the harm caused by the misconduct or error.  (*People v. Hinton* (2006) 37 Cal.4th 839, 863.)

2.      *Analysis*

Defense counsel did not object to the prosecutor's rebuttal argument at the time it was given.  The failure to raise the issue of prosecutorial conduct at trial generally forfeits the right to appellate review of that issue.  (*People v. Thomas* (2011) 51 Cal.4th 449, 491-492; *People v. Lopez* (2008) 42 Cal.4th 960, 966.)  Although Carr acknowledges that defense counsel raised no objection, he asserts a claim of ineffective assistance of counsel on the ground that his trial counsel failed to object to the prosecutor's rebuttal argument. We need not consider Carr's ineffective assistance of counsel claim, however, because we conclude that there was no prosecutorial error.  (See *People v. Williams* (1998) 17 Cal.4th

26

148, 161, fn. 6 [when an issue of prosecutorial error has been forfeited, an appellate court can reach the merits of the issue in order to reject it].)

During his initial closing argument, the prosecutor discussed White's credibility, and reviewed her testimony about what she witnessed on the night of the shooting. The prosecutor also discussed Dr. Trenkle's testimony, and how that testimony corroborated White's version of events. The prosecutor then reviewed the events leading up to Carr's arrest, and discussed the evidence regarding Carr's gang membership. The prosecutor mentioned Carr's lies during his police interrogation, and reminded the jury about the kite found in Claudie Lee Jones's jail cell, attempting to tie the evidence together to demonstrate that Carr was indeed the person who shot Coleman and killed him.

Defense counsel addressed the jury and noted the lack of fingerprint or DNA evidence linking Carr to the crime. Defense counsel highlighted the fact that Dr. Trenkle's testimony indicated that it was possible that Coleman had been shot in the back, and not in the neck, as White had testified. Defense counsel also noted that Carr had not incriminated himself during his postarrest interview. Most importantly, defense counsel posited that the prosecution's only evidence linking Carr to the shooting was White's testimony, and focused on demonstrating why the jury should question White's credibility with respect to her statements regarding the incident.

In rebuttal, the prosecutor challenged defense counsel's claim that the prosecution's case consisted solely of White's testimony. The prosecutor explained how Dr. Trenkle's testimony regarding the autopsy on Coleman's body was not necessarily inconsistent with White's version of what had occurred. The prosecutor also told the jury

27

why it should not give great weight to the absence of DNA or fingerprint evidence. The prosecutor then argued that there were five factors supporting the People's case: (1) Carr's inconsistent and incriminating statements to police; (2) Carr's failed efforts to convince Matthews to testify on his behalf; (3) the kite found in Jones's cell in which Carr asked Jones to provide false testimony; (4) A.'s incentive to provide positive testimony for Carr because of her attachment to him; and (5) Tonette Jones's transparent lies on Carr's behalf.

Carr relies on *People v. Robinson* (1995) 31 Cal.App.4th 494 (*Robinson*) for his contention that the prosecutor's conduct in this case amounted to "sandbagging." In *Robinson*, the court determined that the prosecutor had committed misconduct by giving a "perfunctory (three and one-half reporter transcript pages) opening argument designed to preclude effective defense reply," followed by a " 'rebuttal' " argument that was "10 times longer (35 reporter transcript pages) than his opening argument." (*Id.* at p. 505.) Carr's comparison of this situation to what occurred in *Robinson* is misplaced.

Here, the prosecutor's initial closing argument, comprising approximately 30 transcript pages, cannot be considered "perfunctory." Although the transcript of the prosecutor's rebuttal argument is approximately seven pages longer than his initial closing argument, this fact does not suggest "sandbagging." Moreover, the vast majority of the prosecution rebuttal was a fair response to defense counsel's closing argument theme that the prosecution had only White's testimony to link Carr to Coleman's murder. The prosecutor, commenting on the state of the evidence, noted that there was other evidence, beyond White's testimony, that supported the conclusion that Carr was, in fact,

28

guilty of the crime.  On this record, the prosecutor's remarks constituted permissible rebuttal in response to defense counsel's closing argument.

## IV.

## DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:

NARES, Acting P. J.

McINTYRE, J.